# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RANDOLPH BURLESON,<br><br>Defendant. | Case No. 2:18-cr-00173-LRH-CWH<br><br>**REPORT AND RECOMMENDATION** |

This matter is before the court on defendant Randolph Burleson's motion to suppress (ECF Nos. 17, 18), filed on August 7, 2018. The government filed a response (ECF No. 20) on August 20, 2018. Burleson filed a reply (ECF No. 22) on August 27, 2018. The court held an evidentiary hearing on the motion on September 18, 2018. (Mins. of Proceedings (ECF No. 25).)

**I.   BACKGROUND**

In the early morning hours of March 30, 2018, Las Vegas Metropolitan Police Officers Garcia and Morales were patrolling the Hamptons apartment complex located at 3070 S. Nellis Boulevard in Las Vegas, Nevada. The complex is large, with approximately 20 tri-level apartment buildings as well as carports, basketball courts, and other open areas. Garcia described the apartment complex as poorly lit and with many trees, and he indicated there are certain areas that must be patrolled on foot because they are not visible from a patrol car circling the complex's perimeter. Garcia testified the apartment complex is in a "Phoenix zone," or high-crime area, based on the southeast area command's statistics regarding service calls, traffic stops, and activities such as narcotics use, robberies, and violent crime in the area. Garcia further testified the apartment complex is the "number one" Phoenix zone out of six or seven designated high-crime zones in the southeast area command. Garcia testified he receives service calls for the area "every day."

Burleson is a middle-aged African-American man who resided at the apartment complex. Burleson's sister testified that Burleson was living in their mother's apartment, unit 1088, from December 2017 until the date of the incident. Apartment 1088 is in building 15, and Burleson was arrested in front of building 12, which is near his mother's apartment.

Garcia and Morales arrived at the apartment complex at approximately 2:00 a.m., parked their marked patrol cars near the basketball courts, and began patrolling on foot. The officers were not investigating a specific crime but were conducting a "directed patrol" of the complex to make a law enforcement presence. Garcia and Morales were in full uniform.

Garcia testified the officers first saw Burleson when they were near the basketball courts. Burleson caught the officers' attention because he was moving in the shadows of trees and buildings, avoiding lighted areas, and was looking around like he was lost or unfamiliar with the apartment complex. Garcia stated Burleson was holding a canned beverage in his left hand, a binder under his right arm, and he kept his right hand near his waistband the entire time they observed him. Garcia could not tell Burleson's race[1] or see whether he was wearing glasses, but he could see Burleson was wearing jeans, a black jacket, and a "beanie" hat. The officers watched Burleson make a "straight beeline" in front of them, from underneath a tree and across a walkway to a poorly-lit corner of a nearby building. Burleson looked around the corner of the building at least two times at a couple sitting on a lighted patio. The man was smoking a cigarette and the woman was working on a laptop computer. According to Officer Garcia, the couple seemed unaware of Burleson's presence. Burleson continued to hold his right hand near his waistband as he was observing the couple.

Garcia testified the second time Burleson looked around the corner, Burleson looked in the officers' direction and that he and Burleson made eye contact. Burleson then turned and briskly walked away from the couple and the officers. Morales notified dispatch the officers would be conducting a suspicious person stop. According to Garcia, it appeared Burleson was

---

[1] Although Officer Morales did not testify at the evidentiary hearing, in his body camera footage he refers to Burleson as a "W.M.A.," which Officer Garcia testified is an acronym for "white male adult."

trespassing. Garcia testified there are "no trespassing" signs posted in the complex to deter foot traffic from a nearby liquor store and a convenience store. The officers continued to follow Burleson, and the following exchange then took place between Officer Garcia and Burleson:

> Garcia: "Hey what's up man, let me talk to you real quick."
>
> Burleson: inaudible[2]
>
> Garcia: "Let me talk to you."

Garcia testified Burleson mumbled something in response and then began running away from the officers. Garcia, who was approximately 15 yards behind Burleson, and Morales, who was approximately 25 yards behind Burleson, took chase. The officers did not identify themselves as police officers or command Burleson to stop, but Garcia yelled to Burleson, "I'm catching you," which caused Burleson to look back and allowed Garcia to gain on him. Garcia testified that during the foot pursuit, Burleson's right arm did not move from his waistband but that his left arm was moving, even though he was still holding a can in his left hand. Burleson eventually slipped and stumbled on a wet, grassy hill, where Garcia overtook him and pinned him to the ground. Based on the body camera footage, the entire pursuit lasted approximately 20 seconds.

While Burleson was pinned to the ground, his left arm was above his head, but his right arm was underneath him, near his waistband.[3] Garcia commanded Burleson to remove his right hand from underneath him and attempted to physically move his right hand behind his back to handcuff him, which Burleson resisted. Garcia testified he did not know what Burleson was holding in his right hand but that he thought it was something Burleson did not want the officers to discover such as a weapon, drugs, or an identification card. Ultimately, Burleson was handcuffed and lifted off the ground to his feet, when Garcia heard a metallic object hit the ground. Garcia confirmed the object was a firearm and was recorded on the body camera footage

---

[2] Burleson's response is inaudible on the officers' body camera footage. But Officer Garcia testified at the evidentiary hearing that Burleson responded, "for what?"

[3] Although the officers' body cameras were operating from the beginning of their foot patrol near the basketball court, Burleson is not clearly visible in either officers' footage until after Garcia pinned Burleson to the ground. The lighted porch where the couple sat, however, is visible on the body camera footage.

1  stating "Yep, 413." Garcia testified 413 is a police code for firearm. Garcia told Burleson he was
2  "lucky he didn't get fucking shot."
3  Burleson was indicted with a single count of being a felon in possession of a firearm in
4  violation of 18 U.S.C. § 922(g)(1). (Indictment (ECF No. 1).) Burleson now moves to suppress
5  the firearm the officers found on the ground at the place Burleson was detained. The government
6  responds that under the totality of the circumstances, the officers had reasonable suspicion to
7  justify the seizure and that the evidence recovered should not be suppressed.

**II.    ANALYSIS**

**A.  *Terry* stop**

Burleson moves to suppress the firearm, arguing the officers lacked reasonable suspicion to detain him at the time they initially spoke with him. Burleson argues that he was not acting suspiciously but was returning home to his mother's apartment. Burleson further argues his flight did not give the officers reasonable suspicion to arrest him. According to Burleson, his flight was not suggestive of wrongdoing because there was no indication Burleson knew Garcia and Morales were police officers and that a reasonable person in Burleson's circumstances would fear the unidentified people who approached him in the early morning hours in a purported high-crime area and demanded to speak with him. Burleson alternatively argues that even if he knew Garcia and Morales were police officers, an African-American man had justifiable reasons to avoid contact with police officers under these circumstances, which was confirmed by Garcia's comment to Burleson after detaining him that he was lucky he did not get shot. Burleson also argues he never clearly disobeyed the police.

The government responds that under the totality of the circumstances, including the apartment complex's high-crime location, Burleson's suspicious conduct before Garcia spoke to Burleson, and Burleson's subsequent flight, the *Terry* stop was proper. The government argues after Burleson was seized, the fact he kept his right hand in front of his body after being ordered to remove it gave Garcia reasonable suspicion that Burleson was committing or was about to commit a crime and that he may be armed. Regarding Burleson's argument he did not know Garcia and Morales were police officers, the government responds the officers were in uniform

and were walking in lighted areas of the complex until Burleson fled, and Burleson looked at the officers before and after he fled.

An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id.* "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sigmond-Ballasteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273).

A reviewing court's determination of reasonable suspicion is a process that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (citing *Cortez*, 449 U.S. at 418). The Fourth Amendment is satisfied if an officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot and observation of factors which are by themselves consistent with innocence but may collectively amount to reasonable suspicion. *Id*. at 273-74. Reasonable suspicion is not a matter of hard certainties, but of probabilities. *Cortez*, 449 U.S. at 417-18. However, reasonable suspicion requires more than an officer's "hunch" even if the hunch later turns out to be a good one. *Terry*, 392 U.S. at 27. The reasonable suspicion standard is less than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Here, the court finds the officers had reasonable suspicion to detain Burleson pending further investigation. The officers observed Burleson avoiding lighted areas as he moved through the apartment complex, and given that Burleson was looking up and around, it was reasonable for the officers to believe he was not familiar with the apartment complex and potentially was a trespasser. All the while, Burleson was holding his right hand at his waistband, which reasonably suggested to the officers that he may be holding a weapon or an item he wanted to hide. The

officers watched Burleson surreptitiously observe the couple on the lighted patio from around the corner, while he continued to hold his right hand at his waistband.  Additionally, Garcia testified that the Hamptons are in a high-crime zone and that he received service calls for the apartment complex daily.  When Garcia called out to Burleson, he began running, and continued to hold his right hand at his wristband while running, even though his left arm was swinging, giving the officers reason to believe Burleson was armed or was attempting to conceal something from the officers.

Burleson argues his actions are consistent with a person who was returning home to his apartment in the early morning hours and who wanted to avoid contact with unknown individuals in a purported high-crime neighborhood.[4]  Of course, there are many innocent reasons why a person may avoid contact with others in the early morning hours in a high-crime neighborhood, and the officers did not identify themselves as police officers or direct Burleson to stop.  But the officers were in full uniform and were walking in lighted areas until they took chase, and Garcia testified that Burleson made direct eye contact with him before he began running, and Burleson also looked back at him when Garcia yelled he was catching up to him.  While certain actions Burleson took may by themselves be consistent with innocent behavior, under the totality of the circumstances, including the location the officers were patrolling, Burleson's conduct before Garcia spoke to him, and his subsequent flight, there were "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the officers' belief that there was reasonable suspicion to detain Burleson.  *Terry*, 392 U.S. at 21.  Further, even if "the conduct justifying the stop was ambiguous and susceptible of an innocent explanation . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity."  *Illinois v. Wardlow*, 528 U.S. 119, 125 (U.S. 2000).

///

---

[4] To the extent Burleson argues he knew Garcia and Morales were police officers but had justifiable reasons to run from the officers given his race, the evidence presented at the evidentiary hearing indicates the officers did not know Burleson's race until he was detained, and on the body camera footage Morales is recorded as initially identifying Burleson as a white male.

**B. Arrest**

Burleson further argues that even if there was reasonable suspicion justifying a *Terry* stop, his detention was an arrest and therefore required probable cause he had committed or was committing a crime. In arguing his detention was an arrest, Burleson highlights the fact he was tackled, pinned to the ground, ordered not to move, and handcuffed, all before the officers saw the gun. The government responds that a *Terry* stop contemplates physical force or a show of authority, so pinning Burleson to the ground and handcuffing him did not transform the *Terry* stop into an arrest.

There is no "litmus-paper test . . . for determining when a seizure exceeds the bounds of an investigative stop." *Florida v. Royer*, 460 U.S. 491, 506 (1983). In determining whether an investigative detention has ripened into an arrest, the court considers the "totality of the circumstances." *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988); *see also United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990). When assessing the circumstances, the court considers whether "the investigative methods employed . . . [are] the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Baron*, 860 F. 2d at 914 (quoting *Royer*, 460 U.S. at 500).

The Supreme Court has permitted limited intrusions of a suspect's liberty during a *Terry* stop to protect officer safety. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (finding a police officer may take reasonable measures to neutralize the risk of physical harm and determine whether the person in question is armed). An investigative stop is not transformed into an arrest merely because the police use force in handling the suspect. *See, e.g., United States v. Alvarez,* 899 F.2d 833, 838–39 (9th Cir.1990) (officers did not arrest defendant when they approached his vehicle with guns drawn and ordered defendant to step out of his car); *United States v. Buffington*, 815 F.2d 1292, 1300 (9th Cir. 1987) (suspects not arrested when ordered to get out of their car and lie down on pavement); *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979) (finding the use of force does not convert a stop to an arrest "if it occurs under circumstances justifying fears for personal safety."). "Handcuffing a suspect does not necessarily dictate a finding of custody." *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981). Where a suspect threatens physical

danger or flight, officers may use handcuffs in a *Terry* stop. *See Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996) ("We have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as . . . where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight . . . ."); *United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982).

Under the totality of the circumstances, the officers' utilization of force in tackling, pinning down, and handcuffing Burleson to effectuate the detention did not ripen the detention into an arrest. The entire time he was running, Burleson kept his right hand at his waistband, while his left arm was swinging freely. He did not comply with Garcia's command to remove his right hand from underneath him after he had been tackled, raising a reasonable possibility in Garcia's mind that Burleson was armed.

In conclusion, the court finds there was reasonable suspicion to detain Burleson, the use of force and handcuffing did not ripen the detention into an arrest, and it is not necessary to suppress any evidence because of Burleson's initial detention. The court therefore will recommend that Burleson's motion be denied.

## III. CONCLUSION

IT IS RECOMMENDED that defendant Randolph Burleson's motion to suppress (ECF No. 17) be DENIED.

## IV. NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: October 29, 2018

C.W. HOFFMAN, JR.
UNITED STATES MAGISTRATE JUDGE